**Slip Opinion 05-38**

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                                         :
NIPPON STEEL CORPORATION,                                :
NKK CORPORATION,                                         :
KAWASAKI STEEL CORPORATION                               :
        and                                              :
TOYO KOHAN CO., LTD.,                                    :
                                                         :
        Plaintiffs,                                      :
                                                         :
        v.                                               :    Court No. 00-09-00479
                                                         :
UNITED STATES,                                           :    **Public Version**
                                                         :
        Defendant,                                       :
                                                         :
INTERNATIONAL STEEL GROUP INC.,                          :
                                                         :
        Defendant-Intervenor.                            :
_____          :

[ITC third remand determination sustained.]

                                                    Dated:  March 23, 2005

Willkie Farr & Gallagher LLP (William H. Barringer, Christopher Dunn, James P. Durling, Daniel L. Porter, and Robert E. DeFrancesco) for plaintiffs.

Lyn M. Schlitt, Director of Office of External Relations, James M. Lyons, General Counsel, Marc A. Bernstein, Assistant General Counsel, United States International Trade Commission (Laurent de Winter and Neil J. Reynolds) for defendant.

Stewart and Stewart (Terence P. Stewart, Eric P. Salonen, Sarah V. Stewart, and Jordan Taylor) for defendant-intervenor.

**OPINION**

**RESTANI, Chief Judge:**

Before the court is the United States International Trade Commission's ("Commission" or "ITC") third remand determination concerning tin- and chromium-coated steel sheet

("TCCSS" or "tin plate") imports from Japan. Views of the Commission on Third Remand, ("Third Remand Determination"). In its original determination, the Commission concluded that the United States TCCSS industry was materially injured by reason of TCCSS imports from Japan ("subject imports") that were sold at less than fair value ("LTFV"). Tin- and Chromium-Coated Steel Sheet From Japan, 65 Fed. Reg. 50,005, USITC Pub. 3300, Inv. No. 731-TA-860 (final determ.) (Aug. 2000) (A.R. 2-148) ("Final Determination"). The court, however, found that the Commission's analysis was inadequate, and remanded the matter for further investigation. Nippon Steel Corp. v. United States, 182 F. Supp. 2d 1330, 1356 (Ct. Int'l Trade 2001) ("Nippon I"). On remand, the Commission again determined that the domestic industry was materially injured by reason of subject imports. Tin- and Chromium-Coated Steel Sheet from Japan, Inv. No. 731-TA-860 (final determ.) (March 2002) (A.R. 2-261R) ("First Remand Determination"). Because the Commission's conclusions were unsupported by substantial evidence, and because the Commission failed to address Plaintiffs' claims and the court's concerns, the court vacated the Commission's decision and directed it to enter a negative determination. Nippon Steel Corp. v. United States, 223 F. Supp. 2d 1349, 1371–72 (Ct. Int'l Trade 2002) ("Nippon II"). On appeal, the Federal Circuit vacated the court's decision in Nippon II, and remanded the matter to the Commission "to attend to all the points made by the Court of International Trade." Nippon Steel Corp. v. International Trade Commission, 345 F.3d 1379, 1382 (Fed. Cir. 2003) ("Nippon III"). On remand, the Commission again entered an affirmative material injury determination. Tin- and Chromium-Coated Steel Sheet from Japan, Inv. No. 731-TA-860 (Feb. 2004) (A.R. 2-263R) ("Second Remand Determination"). Because the record supported only a negative determination, however, and because the Commission was

unable to obtain new evidence to significantly supplement the record, the court remanded the matter to the Commission with instructions to (1) issue a negative material injury determination, and (2) determine whether the domestic industry was threatened with material injury.[1]  Nippon Steel Corp. v. United States, 350 F. Supp. 2d 1186 (Ct. Int'l Trade 2004) ("Nippon IV").[2]

Now, after a third remand, the Commission issues a determination that the domestic industry is neither materially injured nor threatened with material injury by reason of Japanese TCCSS imports.  The Commission notes, however, that it would have not made this determination in absence of the court's directive in Nippon IV.  Defendant-intervenor, International Steel Group Inc. ("ISG"),[3] challenges the Commission's determination, arguing that the record as a whole supports an affirmative threat determination.  Plaintiffs, Nippon Steel Corporation, NKK Corporation, Kawasaki Steel Corporation, and Toyo Kohan Co., Ltd. (collectively "Plaintiffs"), agree with the Commission's negative determination, but challenge certain subsidiary findings.  For the reasons set forth below, the Commission's Third Remand Determination is sustained.

---

[1] Although the court previously declined to remand this matter for a determination of threat, largely on the basis that the defendant-intervenor neither raised the issue before the court nor presented a viable threat case to the Commission, see Nippon Steel Corp. v. United States, No. 00-09-00479, Slip Op. 02-116 (Ct. Int'l Trade Sept. 26, 2002), the court in Nippon IV concluded that "it is better practice for the agency in the first instance to determine whether a threat of injury dispute remain[ed]."  350 F. Supp. 2d at 1222.

[2] The court assumes familiarity with its earlier opinions.

[3] On November 24, 2004, the court entered an order substituting ISG as defendant-intervenor in place of Weirton Steel Corporation.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000).  The court will uphold the Commission's final determination in an antidumping investigation unless it is "unsupported by substantial evidence on the record, or is otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (2000).

**DISCUSSION**

The statute directs the Commission to "make a final determination of whether . . . an industry in the United States . . . is materially injured, or . . . threatened with material injury . . . by reason of [LTFV] imports . . . ."  19 U.S.C. § 1673d(b).  In this case, the Commission determined that the domestic TCCSS industry is neither materially injured nor threatened with material injury by reason of Japanese imports.  The court sustains both determinations as supported by substantial evidence and otherwise in accordance with the law.

**I.      Material Injury**

An affirmative material injury determination requires the Commission to find that the volume, price effects, and impact of the subject imports are significant, and that the material injury was by reason of the subject imports.  Id. § 1677(7)(B).  In its Third Remand Determination, the Commission concluded that the domestic TCCSS industry is not materially injured by Japanese imports, stating that it "must issue" this determination "in the place of [its] previous affirmative determination" to comply with the court's order in Nippon IV.[4]  Third

---

[4] Although the Commission complied with the court's order, it insists that the court exceeded the scope of its authority.  The Commission characterizes the court's action as a re-weighing of the facts.  The court, on the other hand, found that after viewing the entirety of the evidence in context, such evidence could not support the Commission's determination.  Under

(continued...)

Remand Determ. at 8.  As discussed at length in Nippon IV, despite some isolated fragments of positive evidence, the record in this case does not show that subject imports had a significant effect on domestic prices, or that purchasers bought significant volumes of subject imports by reason of lower prices.  Instead, "the record fully supports a negative determination and will not support an affirmative one."  Nippon IV, 350 F. Supp. 2d at 1222 (emphasis in original).  Accordingly, pursuant to the court's directions, the Commission issued a negative finding as to material injury, which the court sustains.

## II.     Threat of Material Injury

In a threat of material injury determination, the Commission must consider whether "further dumped . . . imports are imminent and whether material injury by reason of imports would occur unless an order is issued."  19 U.S.C. § 1677(7)(F)(ii).  The statute directs the Commission to consider, among other relevant factors,

> (II) any existing unused production capacity or imminent, substantial increase in production capacity in the exporting country indicating the likelihood of substantially increased imports of the subject merchandise into the United States, taking into account the availability of other export markets to absorb any additional exports,
> (III) a significant rate of increase of the volume or market penetration of imports of the subject merchandise indicating the likelihood of substantially increased imports,
> (IV) whether imports of the subject merchandise are entering at prices that are likely to have a significant depressing or suppressing effect on domestic prices, and are likely to increase demand for further imports,
> (V) inventories of the subject merchandise,

---

[4](...continued)
such circumstances, the court issued appropriate remand instructions.  Because this matter was sufficiently addressed in Nippon IV, see 350 F. Supp. 2d at 1221–22, the court will not discuss it again here in detail.

(VI) the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products, . . .

(VIII) the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

(IX) any other demonstrable adverse trends that indicate the probability that there is likely to be material injury by reason of imports (or sale for importation) of the subject merchandise (whether or not it is actually being imported at the time).

19 U.S.C. § 1677(7)(F)(i).[5]  The Commission must evaluate these statutory factors "as a whole." Id. § 1677(7)(F)(ii).  Moreover, a threat determination may not be made on the basis of "mere conjecture or supposition."  Id.

In this case, although it found that certain statutory factors weigh in favor of an affirmative threat determination, the Commission concluded that it "simply [cannot] issue[] an affirmative threat determination and act[] consistently with the [c]ourt's opinion [in Nippon IV]."  ITC Reply Br. at 3.  Thus, the Commission determined that the domestic industry is not threatened with material injury by reason of TCCSS imports from Japan.  ISG challenges the Commission's determination, arguing that regardless of the court's opinion in Nippon IV, the record as a whole supports an affirmative threat determination.  Plaintiffs agree with the Commission's negative threat determination, but challenge certain subsidiary findings.  The statutory factors of (A) production capacity, (B) volume and market penetration, and (C) domestic price depression and suppression, are discussed below.[6]

---

[5] Subsections (I) and (VII) deal with subsidies and raw agricultural products, respectively, and do not apply to this investigation.  See id. § 1677(7)(F)(i)(I), (VII).

[6] Although the Commission addressed all of the statutory threat factors, neither ISG nor Plaintiffs dispute the Commission's findings regarding inventories of subject imports (factor V),

(continued...)

### A.        Production Capacity

In making a threat determination, the Commission is required to analyze whether any unused production capacity or any imminent, substantial increase in production capacity in the foreign country indicates the likelihood of substantially increased subject imports into the U.S. See id. § 1677(7)(F)(i)(II).  In this case, although the Commission ultimately issued a negative threat determination, it found that existing unused production capacity in Japan could be used to significantly increase imports of subject merchandise to the United States in the imminent future. The Commission relies on the fact that the amount of unused production capacity in Japan was greater than the volume of TCCSS shipments to the U.S.  Given the low level of Japanese imports, however, this is not remarkable.[7]  Further, unused production capacity alone is insufficient to reasonably indicate that increased imports into the United States are likely. See 19 U.S.C. § 1677(7)(F)(i)(II) (requiring ITC to "tak[e] into account the availability of other export markets to absorb any additional exports").  The Commission cannot simply view unused production capacity in isolation and find a possibility of increased U.S. shipments.  It must examine the likelihood of this eventuality.  Moreover, as Plaintiffs point out, (1) high capacity utilization rates over the period of investigation, (2) large volumes of shipments to non-U.S.

---

[6](...continued)
the potential negative effects on the existing development and production efforts of the domestic industry (factor VIII), or the vulnerability of the domestic industry (19 U.S.C. § 1677(7)(F)(i) ("other relevant economic factors")).

[7] Relative to consumption of TCCSS in the United States, the market share of subject imports in terms of quantity was [
                              ]. Staff Report at IV-5, Table IV-4.  In contrast, the market share held by the domestic industry in terms of quantity was [
                              ]. Id.

markets, and (3) reductions in Japan's TCCSS capacity, undercut the Commission's finding that subject imports will significantly increase in the future.

First, Japan's capacity utilization was 89.0% in 1997, 85.4% in 1998, and 88.5% in 1999 and these rates were projected to increase in 2000 and 2001.[8] Staff Report at VII-3, Table VII-2. The Commission concedes that these rates were high, ITC Reply Br. at 4; however, it argues that this fact is irrelevant because Japanese producers still had the ability to increase exports to the United States. The record shows, however, that in 1998 and 1999, when U.S. exports increased, capacity utilization rates were lower than in 1997; and between the first quarters of 1999 and 2000, U.S. exports declined by nearly half, as capacity utilization increased from 89.5% to 91.0%.[9] This evidence demonstrates that rising capacity utilization rates do matter, and supports a finding of no threat.

---

[8] In comparison to other cases of threat, the rates here are high. See Kern-Liebers USA v. United States, 19 CIT 87, 88–90 (1995) (finding that capacity utilization rates, "which ranged from 74.4% to 77.8%, were . . . very low for this industry . . . [and] are supportive of a threat finding"); see also Asociacion de Productores de Salmon y Trucha de Chile AG v. United States, 180 F. Supp. 2d 1360, 1372 (Ct. Int'l Trade 2002) (recognizing "that incentives exist for subject producers to expand production when low capacity utilization exists"); Companhia Paulista De Ferro-Ligas v. United States, 20 CIT 473, 483 (1996) (upholding ITC finding that "very low capacity utilization, reasonably demonstrates a probability that [subject] imports will be a cause of actual injury in the near future"); Citrosuco Paulista, S.A. v. United States, 12 CIT 1196, 1220, 704 F. Supp. 1075, 1095 (1988) (upholding Commission's finding that low utilization levels, among other factors, supports a positive threat determination).

[9] Capacity utilization rates compared to short tons of TCCSS exported to the U.S. were as follows: [

]. Staff Report at VII-3, Table VII-2.

Second, over the period of investigation, roughly three-fourths of total Japanese exports were to non-U.S. markets, and that amount was projected to rise in the future.[10] Although it may be reasonable for the Commission to discount projected increases, due to the stability of past shipments, the fact remains that the vast majority of past Japanese exports targeted third-country markets.

Third, the Staff Report reveals that three of the four major Japanese TCCSS producers reported decreases in their TCCSS capacity.[11] Moreover, the Commission points out that Japanese producers have a limited ability to shift production between subject and non-subject products. Third Remand Determ. at 13 n.67 (considering product-shifting as instructed by factor VI). This evidence suggests that once Japanese producers shift production to non-subject merchandise, their ability to easily shift back to TCCSS is limited.

As a whole, high capacity utilization rates, large volumes of shipments to third-country markets, and reductions in Japan's TCCSS capacity contradict the Commission's subsidiary conclusion with respect to production capacity. This evidence does, however, support the Commission's overall negative threat determination. See Am. Bearing Mfrs. Ass'n v. United

---

[10] The percentage of total TCCSS exports shipped to non-U.S. markets over the period of investigation were [
          ]. Id.

[11] [



          ]. Staff Report at VII-3, Table VII-2 n.1.

States, 350 F. Supp. 2d 1100, 1124 (Ct. Int'l Trade 2004) (upholding ITC's finding that

substantially increased imports not likely where "subject foreign producers reportedly operated

at high rates of capacity utilization and devoted a significant portion of their exports to markets

other than the United States"); Taiwan Semiconductor Indus. Ass'n v. United States, 24 CIT

914, 930, 118 F. Supp. 2d 1250, 1264 (2000) (upholding ITC's conclusion that production

capacity did not indicate likelihood of increased subject imports based, in part, on evidence that

"several foreign producers reported . . . that new capacity would not be dedicated to [subject]

production").

### B.        Volume and Market Penetration

As part of its required threat evaluation, the Commission is also obligated to consider

whether a significant increase in volume or market penetration indicates the likelihood of

substantially increased subject imports.  19 U.S.C. § 1677(7)(F)(i)(III).  In this case, the

Commission found that, contrary to its ultimate determination, increases in volume and market

penetration of subject imports show that substantially increased subject imports are likely.

Plaintiffs counter that the Commission's analysis fails to consider the context of the broader

TCCSS market.

The volume and market share of subject imports grew over the period of investigation.[12]

In determining whether these increases evidence the likelihood of substantially increased imports

and a threat of material injury, however, the Commission must consider prevailing market

_____

[12] Exports of Japanese TCCSS, in short tons, to the U.S. were [

                                                                     ]. Staff Report at VII-3, Table VII-2.  The
market share of subject imports also increased from [
                                              ]. Id. at IV-5, Table IV-4.

conditions in the TCCSS industry.  See 19 U.S.C. § 1677(7)(F)(i) (requiring the ITC to consider

"other relevant economic factors"); Statement of Administrative Action, H.R. Doc. No. 316,

103rd Cong., 2nd Sess. (1994), reprinted in Uruguay Round Agreements Act, Legislative

History, Vol. VI, at 885 ("In threat determinations, the Commission must carefully assess current

trends and competitive conditions in the marketplace to determine the probable future impact of

imports on the domestic industry and whether the industry is vulnerable to future harm.");

Asociacion de Productores de Salmon y Trucha de Chile AG, 180 F. Supp. 2d at 1373 ("Under

U.S. law, where there is evidence that the U.S. industry is . . . threatened with injury, by factors

other than less than fair value imports, the Commission must consider all relevant economic

factors.").  As Plaintiffs note, market conditions such as domestic supply problems and regional

zones of competition undercut the likelihood that the domestic TCCSS industry is threatened

with material injury by reason of increased subject imports.

With respect to domestic supply problems, the record consistently shows that purchasers

bought increased volumes of subject imports primarily because of concerns with U.S. suppliers'

quality and reliability.  See Nippon IV, 350 F. Supp. 2d at 1213–19.  Moreover, in a dissenting

opinion, Chairman Koplan recognized that such domestic problems would likely decrease in the

future.  See Koplan Dissent, (Aug. 11, 2000), at 19, A.R. 2-149, Pls.' App., Tab 6 (concluding

that subject imports do not threaten material injury, in part, because "Weirton, having re-started

its second blast furnace, is positioned to improve its performance and recapture any sales lost

due to poor on-time performance").  This information suggests that substantial increases in

subject import volume and market share are unlikely.

Regarding regional zones of competition, subject producers compete heavily on the West Coast while domestic producers primarily supply East and Midwest purchasers. See Nippon IV, 350 F. Supp. 2d at 1219–20. Furthermore, this segregated competition is not expected to change. See Koplan Dissent, at 19, Pls.' App., Tab 6 ("Imports from Japan into the West have held relatively constant as a percent of their total imports for roughly ten years. I do not anticipate that ratio changing. Thus, I would not expect subject import volume to increase imminently or to shift to a greater emphasis away from the West."). This market condition mitigates the likelihood of threat by reason of increased subject imports.

Although for present injury purposes, "in isolation the Commission's determination with respect to the significance of subject import volume is supported by substantial evidence," Nippon I, 182 F. Supp. 2d at 1340 (emphasis added), in the context of the prevailing market conditions in the TCCSS industry, the Commission's subsidiary finding, with respect to substantial future increases in subject import volume, is not.

### C.     Domestic Price Depression and Suppression

The statute governing threat also instructs the Commission to consider whether subject imports are entering at prices likely to have a significant depressing or suppressing effect on domestic prices. See 19 U.S.C. § 1677(7)(F)(i)(IV). In its Third Remand Determination, the Commission noted that the court in Nippon IV rejected its findings of significant price effects in the present material injury context. The Commission concluded that in light of the court's opinion, it was precluded from finding that subject imports are likely to enter at prices that will suppress or depress domestic prices in the imminent future. ISG asserts that the Commission

erred by failing to conduct a full threat analysis.  Contrary, to ISG's contention, the

Commission's analysis is reasonable.

Although a threat inquiry is a separate matter from a material injury investigation,

see Republic Steel Corp. v. United States, 8 CIT 29, 40, 591 F. Supp. 640, 650 (1984),

"[n]othing in the threat statute forbids the ITC from considering the . . . price effects findings it

is obligated to make with respect to present material injury." Am. Bearing Mfrs. Ass'n, 350 F.

Supp. 2d at 1127 n.26.  In other words, the fact that the record in this case does not support a

finding of significant price suppressing or depressing effects for purposes of material injury, is

relevant to the Commission's threat inquiry.  See id. ("While the absence of any indicia of

present injury is not considered conclusive that threat of injury does not exist, the findings made

with respect to whether there is present material injury are relevant.") (cites, quotes, and

emphases omitted).

Moreover, contrary to ISG's argument, the Commission did not shirk its obligation under

the statute to consider the likelihood of future depressing or suppressing effects on domestic

prices.  Rather, the Commission reasoned as follows:  (1) the court in Nippon IV held that the

record did not substantially support a finding of significant domestic price depression or

suppression, largely because certain conditions of competition minimized any effect subject

imports could have had on domestic prices, Third Remand Determ. at 14 (citing Nippon IV, 350

F. Supp. 2d at 1221); (2) the conditions of competition in the TCCSS industry are not likely to

significantly change in the imminent future,  Id. at 15; and thus, (3) a determination that subject

imports are not likely to enter at prices that will significantly suppress or depress domestic prices

in the imminent future, or at prices that will increase demand for further imports, is appropriate.

Id.  The Commission's conclusion with respect to domestic price suppression and depression is reasonable.[13]

In sum, although record evidence weighs against the Commission's subsidiary findings with respect to production capacity and volume and market penetration, the Commission's conclusion regarding domestic price depression and suppression is reasonable.  Overall, the record as a whole substantially supports the Commission's ultimate conclusion.  Accordingly, the Commission's negative threat of material injury determination is sustained.

## CONCLUSION

Because the Commission's negative material injury and negative threat of material injury determinations are supported by substantial evidence and are otherwise in accordance with law, the Commission's Third Remand Determination is sustained.


                                                        /s/ Jane A. Restani
                                                       Jane A. Restani
                                                       Chief Judge


Dated:  New York, New York
        This 23rd day of March, 2005

---

[13] ISG also argues that the record supports a finding that subject imports will have domestic price depressing and suppressing effects in the imminent future, and requests that this matter be remanded for the Commission's consideration.  ISG Comments at 10 n.14.  The arguments posited, and evidence relied upon, by ISG, however, have previously been considered by the Commission and addressed by the court.  Thus, another remand on this basis is not necessary.